**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIZA MORENO, | Case No. 1:19-cv-01580-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT COMMISSIONER OF SOCIAL SECURITY |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 14, 17) |
| Defendant. | |

**I.**

**INTRODUCTION**

Liza Moreno ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from coronary artery disease status post myocardial infraction and bypass; diabetes with retinopathy; depression; obesity; a history of umbilical hernia; hypertension; and iron deficiency anemia.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States magistrate judge and this action has been assigned to the undersigned magistrate judge for all purposes.  (ECF Nos. 8, 9, 10.)

## II.

## BACKGROUND

### A.    Procedural History

On April 11, 2013, Plaintiff filed a Title II application for disability insurance benefits alleging a period of disability beginning on December 1, 2005.  (AR 151-52.)  Plaintiff's claim was initially denied on August 1, 2013, and denied upon reconsideration on October 8, 2013.  (AR 86-90, 91-92.)  On April 1, 2014, Plaintiff submitted a request for a hearing before an Administrative Law Judge, and on April 30, 2015, Plaintiff appeared before Administrative Law Judge Timothy S. Snelling for the first hearing.  (AR 98-99, 34-63.)  On June 25, 2015, Judge Snelling issued an initial decision finding that Plaintiff was not disabled.  (AR 19-33.)  On September 2, 2016, the Appeals Council denied Plaintiff's request for review.  (AR 1-7.)  Plaintiff then filed a complaint in this Court, and after the parties filed moving papers, the parties agreed to a stipulated voluntary remand and the matter was remanded for further administrative proceedings.  (AR 593-602.)

On remand, the Commissioner selected Administrative Law Judge Vincent A. Misenti (the "ALJ") to preside over the matter.  (AR 639-667.)  The ALJ conducted the second oral hearing on August 6, 2018.  (AR 561-584.)  The ALJ issued the second unfavorable decision on December 6, 2018.  (AR 540-560.)  The Appeals Council denied the request for review on September 21, 2019.  (AR 524-529.)

Plaintiff filed this action on November 5, 2019, and seeks judicial review of the denial of her application for disability benefits.  (ECF No. 1.)  On June 22, 2020, Plaintiff filed an opening brief.  (ECF No. 14.)  Following two stipulated extensions, on August 26, 2020, Defendant filed a brief in opposition.  (ECF No. 17.)  Plaintiff did not file a reply brief.

### B.    Hearing Testimony

Plaintiff testified in person at the August 6, 2018 hearing with the assistance of counsel, who appeared via telephone.  (AR 561-584.)  Plaintiff was 59 years old on the date of the hearing, and was 51 years old on the date last insured.  (AR 565-66.)  Plaintiff was 5'4" tall, and weighed 307 pounds.  (AR 566.)  Plaintiff did not recall her weight on or before December of

2010.  (Id.)

Plaintiff is right-handed.  (Id.)  The ALJ focused his inquiry on the approximate one and a half year period between June 2, 2009, the alleged onset date, and December 31, 2010, the date Plaintiff was last insured.  (Id.)  Plaintiff was married, though her spouse is retired and disabled after suffering strokes and heart problems.  (AR 567-568.)  Plaintiff's spouse was working in 2010.  (AR 568.)  Plaintiff has lived in the same house for nineteen years.  (Id.)

Plaintiff drives about twice a week.  (Id.)  When asked how often Plaintiff was driving in 2010, Plaintiff stated almost every day for work, and then Plaintiff asked whether that was the time she was employed at "ESM," and the ALJ answered not in 2010.  (AR 569.)  Plaintiff asked when she was employed at ESM, the ALJ answered the last work record was in 2005 as material handler for HP and customer service at Baskin-Robbins, and Plaintiff stated she worked at ESM after Baskin-Robbins but did not remember when.  (Id.)

Plaintiff has a high school education.  (Id.)  Noting the amended alleged onset date of June 2, 2009, the ALJ asked if Plaintiff recalled working any job from then until December 31, 2010.  (Id.)  Plaintiff did not remember, stating she believed her last job was with ESM right after Baskin-Robbins.  (Id.)

The ALJ asked which diagnosed medical impairments Plaintiff believed were disabling during the relevant period, and Plaintiff answered her obesity, her weight, diabetes, and a hernia. (AR 570.)  Plaintiff stated the obesity during the relevant period tired her quite a bit, movements such as bending would hurt her back, and her balance was off at times.  (Id.)  Plaintiff tripped at work a couple of times.  (Id.)  The ALJ asked whether the obesity affected the body organs or complicated her medical condition, and Plaintiff stated it affected her heart condition and she had bypass surgery in 1999.  (AR 570-571.)  Plaintiff stated her heart condition impacted her early on, but she still continued to work.  (AR 571.)  Plaintiff stated the obesity impacted her knees but could not remember anything else regarding the obesity's effects.  (Id.)

As for her diabetes mellitus, Plaintiff said she could not explain, but it affected her mostly in making her fatigued during the relevant period.  (AR 571-572.)  During that time, Plaintiff recalled taking an oral medication for diabetes, Metformin, and Plaintiff had problems

with diabetes control.  (AR 572.)  The ALJ inquired about multiple references in the record that showed Plaintiff was not very compliant with taking medications and checking blood sugar levels, and Plaintiff answered she "was and wasn't," and at the time, she kept telling the doctor that the Metformin was making her sick, and after a while they put Plaintiff on insulin.  (AR 572.)  The ALJ inquired about whether the Metformin made her sick and whether she stopped taking it for periods of time, and Plaintiff answered that she would take it, but for periods of time she had problems with it and she kept working with her doctor to try and figure out a better way, and they finally put her on insulin.  (AR 572-573.)  The ALJ inquired again asking: "why did the doctors repeatedly state that you, or at least on multiple occasions, were non-compliant with your diabetes medications?"  (AR 573.)  Plaintiff answered she didn't understand why the doctor would write that, and the ALJ stated the records dated May 4, 2009, March 9, 2010, and April 6, 2010, showed notes that Plaintiff was not compliant and was not following the doctor's orders to take her medications.  (AR 573.)  Plaintiff responded that she was compliant and taking medications.  (Id.)  The ALJ asked "[s]o you just disagree with those notes?"  (Id.)  Plaintiff responded that she does disagree with them because she would take medications unless they were making her sick, and that is when she would return to the doctor, and emphasized that as the records show, she was visiting the doctor quite often because she didn't feel well.  (Id.)  The ALJ concluded that the references were likely regarding Plaintiff not taking medications when they made her not feel well, and Plaintiff said that was when she was working with the doctor to try and figure out if there was a better solution.  (Id.)

The ALJ asked if there was anything else regarding the diabetes that limited Plaintiff during the relevant period, and Plaintiff stated she did not remember much as far as limitations, but just remembered being very tired all the time, and her body aching all of the time.  (AR 574.)  Plaintiff explained that it is "hard to explain – when you're going to the doctor you try to explain just how – what hurts.  Sometimes it's everything hurts.  Sometimes it's just some of the medication they would put me on, I don't remember when it was.  They took me off Lipitor because I was on there because of my diabetes.  And they took me off because that was making – giving me dizziness.  And I don't remember what year that was."  (Id.)

1    The ALJ asked whether Plaintiff was regularly checking her blood sugar levels during the
2    relevant period, and Plaintiff answered yes.  (Id.)  The ALJ asked about records showing
3    problems with control, and Plaintiff confirmed she had such problems, and still does.  (Id.)  The
4    ALJ asked what Plaintiff did when she had problems with the blood sugars fluctuating beyond
5    acceptable levels, and Plaintiff answered she would take the medication again, but she then
6    figured out that because the pills were very big and she would break them in half, but didn't
7    realize they were on a time release, the medication was making her sick because it was absorbing
8    too rapidly.  (AR 575.)  Plaintiff had asked the doctor if she could somehow order a pill that was
9    smaller as she could not swallow them right.  (Id.)

10    Plaintiff's hernia protrudes out of her stomach near her bellybutton, it makes her look
11    pregnant, and it hurts when it touches up against things such as when she would take clothes out
12    of the washing machine, and Plaintiff now has to do it sideways.  (AR 576.)  Plaintiff saw a
13    surgeon but did not have surgery because of her diabetes.  (AR 576.)  The ALJ asked about
14    records showing Plaintiff refused pain medication for her hernia, and Plaintiff confirmed she had
15    refused, explaining that she is on so many medications it makes her feel like she is in a fog, and
16    she would rather deal with pain than have to walk around like a zombie, and a lot of the
17    medications have side effects.  (AR 576-577.)

18    When asked what a typical day was like for Plaintiff during the relevant period, Plaintiff
19    first stated she could not remember, and then stated she felt like she was "functional to a certain
20    point."  (AR 577.)  Plaintiff did not recall how long she was able to sit at one time, and did not
21    recall how long she could stand at one time during the relevant period.  (Id.)

22    Plaintiff's counsel then examined Plaintiff.  (AR 578.)  Counsel asked about problems
23    with fatigue, and Plaintiff answered she felt fatigued or tired all of the time.  (Id.)  Plaintiff
24    confirmed she would have to take a break after starting activities.  (Id.)  Plaintiff stated it varied
25    day to day, but there were points where she would want to sleep all day, and she would get up
26    and then half an hour later she was so exhausted and would just want to lay down again.  (Id.)  It
27    wasn't every day, but Plaintiff would be exhausted a lot of the time, and her "fatigue was
28    through the roof."  (Id.)  Plaintiff would get up because she still had children at home, and would

1  function as much as she could, but she was so tired to the point where she just couldn't function

2  like a normal person.  (<u>Id.</u>)  Plaintiff estimated she was below a 30 or 40 percent level of

3  functioning, and was not sure if it was from diabetes, or her heart.  (<u>Id.</u>)

4          The ALJ then asked if Plaintiff could recall how much weight she could lift, and Plaintiff

5  could not recall.  (AR 579.)

6          The Vocational Expert Lorian I. Hyatt (the "VE") then testified.  (<u>Id.</u>)  The VE testified

7  that Plaintiff's previous work included: (1) ice cream server classified as light, with an SVP of 2;

8  (2) an electronics worker, light, with an SVP of 2; and (3) a food service worker, light, with an

9  SVP of 3.  (AR 580.)  The VE stated these positions were performed at a medium level

10 according to the record.  (<u>Id.</u>)

11         The ALJ's first hypothetical presented an individual with the past work described,

12 possessing a high school education, and capable of performing a light range of work with the

13 following limitations: occasional climbing ramps and stairs; no climbing ladders and scaffolds;

14 frequent balancing, occasional stooping, and occasional crouching; frequent kneeling, and

15 occasional crawling; occasional balancing; no working around unprotected heights; and need to

16 avoid concentrated exposure to moving mechanical parts.  (AR 580-581.)  The VE testified that

17 such person could perform the past jobs described as generally performed, but could not perform

18 the food service worker job as it is typically performed.  (AR 581.)  The VE also testified such

19 person could perform other jobs in the national economy, including: assembler, light with an

20 SVP of 2; inspector, light, with an SVP of 2; and office helper, light, with an SVP of 2.  (<u>Id.</u>)

21         The ALJ then presented a second hypothetical with the same limitations as the first,

22 however, inquired whether such an individual would have any transferable skills to sedentary

23 work.  (AR 581-582.)  The VE testified that the ice cream server and electronic worker jobs are

24 both SVP of 2, and would thus have no transferable skills, and also believed the food service

25 worker position did not have any transferable skills either.  (AR 582.)

26         Counsel then examined the VE.  (<u>Id.</u>)  Counsel presented the first hypothetical with an

27 added limitation that after an hour's worth of work such person would need to take a ten minute

28 break, in addition to normal break periods, and the VE testified such person would be

6

1   unemployable.  (Id.)

2       Counsel made a closing statement that this is a court remand case, that Plaintiff testified

3   consistently at both hearings with the medical records demonstrating that prior to the date of last

4   insured she had severe impairments that limited her capacity to perform work on a consistent

5   basis, and such resulted in an inability to perform past or other work.  (AR 583.)

6       **C.**    **The ALJ's Findings of Fact and Conclusions of Law**

7       The ALJ made the following findings of fact and conclusions of law:

8   •   Plaintiff last met the insured status requirements of the Social Security Act on December

9       31, 2010.

10  •   Plaintiff did not engage in substantial gainful activity during the period from her alleged

11      onset date of December 1, 2005 through the date last insured of December 31, 2010.

12  •   Through the date last insured, and period adjudicated, Plaintiff had the following severe

13      impairments: coronary artery disease status post myocardial infraction and bypass;

14      diabetes with retinopathy; depression; obesity; a history of umbilical hernia;

15      hypertension; and iron deficiency anemia.

16  •   Through the date last insured, Plaintiff did not have an impairment or combination of

17      impairments that met or medically equaled the severity of one of the listed impairments

18      in 20 CFR Part 404, Subpart P, Appendix 1.

19  •   Plaintiff had the residual functional capacity to perform a wide range of light work,

20      specifically: can lift and carry 20 pounds occasionally and 10 pounds frequently; can

21      stand or walk or sit for approximately 6 hours each per 8 hour work day with normal

22      breaks; cannot climb ladders, ropes, or scaffolds, but can occasionally stoop and crouch,

23      and can frequently balance, kneel, crawl, and climb ramps and stairs.

24  •   Through the date last insured, Plaintiff was unable to perform any past relevant work.

25  •   Plaintiff was born on June 2, 1959, and was 51 years old, which is defined as a younger

26      individual aged 18-49, on the date last insured.  Plaintiff subsequently changed age

27      category to closely approaching advanced age.

28  •   Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

- Through the date last insured, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

- Plaintiff was not under a disability, as defined in the Social Security Act, at any time from December 1, 2005, the alleged onset date, through December 31, 2010, the date last insured.

(AR 24-29.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[2] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet

---

[2]  The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. § 404.1501 et seq., and Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq. The regulations are generally the same for both types of benefits. Further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which, considering the record as a *whole*, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

///

///

///

IV.

DISCUSSION AND ANALYSIS

Plaintiff argues the ALJ erred by failing to provide a sufficiently articulated rationale for rejecting Plaintiff's testimony of disabling impairments.  (Pl.'s Opening Br. ("Br.") 5, ECF No. 14.)

### A.   The Clear and Convincing Standard for Weighing Credibility

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004).

Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage,

1   effectiveness or side effects of any medication; other measures or treatment used for relief;

2   functional restrictions; and other relevant factors.  Lingenfelter, 504 F.3d at 1040; Thomas, 278

3   F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary

4   techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

5   statements concerning the symptoms, and other testimony by the claimant that appears less than

6   candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a

7   prescribed course of treatment."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)

8   (quoting Smolen, 80 F.3d at 1284).

9          **B.     Plaintiff's Primary Arguments**

10          Plaintiff first highlights the ALJ's use of boilerplate language that is usually included in

11  every opinion, which Plaintiff argues is deficient if taken alone.  Plaintiff argues it is not the

12  generic language that is error, but the failure to provide specific clear and convincing reasons for

13  the credibility determination.  (Br. 8.)

14          More specifically, Plaintiff contends the ALJ "appears to articulate the rationale that the

15  objective evidence of record is not consistent with the allegations," where the ALJ finds that the

16  subjective statements regarding the impairments and limitations were not entirely consistent with

17  the evidence.  (Br. 8; AR 553.)  Plaintiff argues this reasoning "in and of itself is insufficient to

18  reject the testimony," as the Ninth Circuit requires consideration of "excess pain" and not simply

19  the degree of pain limitation established by objective evidence.  (Br. 8.)  Plaintiff emphasizes the

20  regulations and precedent prohibit rejecting subjective pain testimony solely on the basis of

21  objective medical evidence, Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005).  (Br. 8-9.)

22          Plaintiff argues that the ALJ's attempt to reject the testimony due to poor compliance

23  with treatment is not based on substantial evidence (AR 553), as the record demonstrates that any

24  compliance issues are due to Plaintiff not being able to afford treatment.  Plaintiff concedes the

25  ALJ noted Plaintiff's issues with cost of the treatment (AR 553), though emphasizes the Ninth

26  Circuit has proscribed the rejection of pain testimony for lack of treatment where there record

27  establishes that the claimant could not afford it, and Plaintiff argues the record is replete with

28  notations that Plaintiff had difficulty affording treatment.  (Br. 10.)

1    Finally, Plaintiff notes that as the ALJ did not use Plaintiff's daily activities as a reason to

2    reject the testimony, any argument of such by Defendant must not apply as the Court can only

3    review the rationales articulated in the ALJ's decision, and even if the ALJ had mentioned daily

4    activities, Plaintiff argues that nothing in her descriptions of her limitations or as summarized by

5    the ALJ demonstrate that she is capable of maintaining substantial gainful activity.  (Br. 11.)[3]

6         **C.   The ALJ Provided Clear and Convincing Reasons for Discounting Plaintiff's**
7              **Testimony**

8    Defendant highlights the following of Plaintiff's testimony that was noted by the ALJ:

9    Plaintiff alleged she was unable to work due to diabetes, depression, hernia, obesity, a heart

10   condition, high blood pressure, high cholesterol, back pain, and knee pain; (AR 180, 550);

11   Plaintiff testified that she stopped working in 2005 because she fell on the job and her employer

12   terminated her (AR 43-45, 550); Plaintiff alleged that her hernia was bothering her in 2009 (AR

13   50, 550); Plaintiff testified that she could not do her job in 2009 from the bending and brushing

14   up against her, that bending hurt her stomach, that touch was painful to the stomach, and her

15   stomach swelled (AR 55-56, 550); Plaintiff alleged "being very tired" or "so tired" "all the time"

16   and was at 30 to 40 percent functioning prior to the date last insured (AR 550, 574, 578).  (Opp'n

17   13.)

18   Defendant argues the ALJ provided at least four compelling reasons, supported by

19   substantial evidence, for finding Plaintiff's subjective allegations of disabling symptoms

20   inconsistent with the record overall (AR 546-553).  (Opp'n 13.)  Plaintiff submitted no reply

21   brief specifically addressing these four reasons argued by Defendant.  The Court now turns to

22   each of these arguments.

23        1.   The ALJ Properly Found a Lack of Objective Medical Evidence

24   Plaintiff is correct that a lack of objective medical evidence cannot form the sole basis

25   presented by the ALJ for rejecting pain testimony, however, it is clearly a proper factor the ALJ

26

27   _____
     [3]  Defendant responds that given that the ALJ did not articulate Plaintiff's activities as a factor against her claim, this
28   is a non-issue.  Furthermore, the ALJ has articulated other valid reasons for discounting Plaintiff's statements of
     subjectively disabling symptoms; thus, the ALJ's decision should be upheld.  (Opp'n 20.)  The Court agrees.

1    may consider in weighing a claimant's testimony.  See Vertigan v. Halter, 260 F.3d 1044, 1049

2    (9th Cir. 2001) ("The fact that a claimant's testimony is not fully corroborated by the objective

3    medical findings, in and of itself, is not a clear and convincing reason for rejecting it."); Burch,

4    400 F.3d at 680-81 ("Although lack of medical evidence cannot form the sole basis for

5    discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis . . .

6    Contrary to Burch's argument, the ALJ did not solely rely on the minimal objective evidence and

7    Burch's daily activities in discrediting her testimony.  Indeed, these factors were among those he

8    relied on, however, the ALJ made additional specific findings to support his credibility

9    determination.").

10       Defendant argues that the ALJ provided numerous examples of objective findings, "or

11   more precisely, an utter lack of any objective findings," that contradicted Plaintiff's claims of

12   disabling or severe impairments.  (Opp'n 14.)

13       First, as for allegedly disabling back pain, knee pain, and musculoskeletal issues, the ALJ

14   found insufficient evidence to find Plaintiff's alleged back and knee conditions were severe

15   impairments prior to the date last insured.  (AR 546.)  Specifically, as highlighted by Defendant,

16   the ALJ cited a number records in support of this finding, noting the following aspects: on

17   August 17, 2007, review of symptoms were negative for neurological or musculoskeletal

18   complaints, Plaintiff had no musculoskeletal tenderness, and range of motion was normal (AR

19   268); on August 22, 2007, Plaintiff reported a three day history of back pain, but denied joint or

20   muscle pain, the exam showed no acute distress, and there was no diagnosis related to a

21   musculoskeletal disorder (AR 356-357)[4]; on October 26, 2007, Plaintiff had normal gait and

22   sensation, no atrophy, and normal strength in all extremities (AR 348-351)[5]; then "[a]fter a gap

23   in treatment of 18 months, chart notes dated April 15, 2009 indicated" Plaintiff presented with

24   normal range of musculoskeletal motion and denied joint pain on review of symptoms (AR 342-

25

26   [4]  The date of the visit appears to be August 21, 2007, though it was signed on August 22, 2007.  (AR 355-56.)
     Plaintiff presented after not having "any medical care" for three years, started having chest pain, and reported lower
27   back pain three days prior.  (AR 356.)

28   [5]  The October 26, 2007 record also showed 5/5 motor strength (AR 348-351.)  This record was also cited in regards
     to Plaintiff's statements concerning diabetes.  (AR 348-351, 552.)

343)[6]; on May 4, 2009, Plaintiff denied myalgia (AR 336)[7] and on June 30, 2010, Plaintiff denied musculoskeletal or neurologic symptoms (AR 243).  (AR 546, 552.)  The ALJ concluded that there was "insufficient evidence to suggest that the claimant had a musculoskeletal impairment that had more than a minimal impact on the claimant's ability to perform work related activities [and thus] [h]er alleged back and knee impairments [we]re therefore non-severe."  (AR 546.)

Next, the ALJ found Plaintiff's medically determinable mental impairment of depression did not cause more than a minimal limitation in the ability to perform basic mental work activities, and was non-severe.  (AR 548.)  The ALJ stated that while Plaintiff claimed disability due to depression when she filed her application, the evidence prior to the date last insured "makes scant mention of any mental symptoms or treatment," and rather to the "contrary, most of the chart notes indicate normal mental status."  (AR 547.)  In support of this determination, the ALJ noted the following: on August 17, 2007, chart notes indicated Plaintiff was alert and oriented, and review of symptoms were negative for psychiatric complaints (AR 267); on August 22, 2007, other than a note about being upset about finances, there was no diagnosis of a mental impairment (AR 355); on September 18, 2007,[8] and October 26, 2007, Plaintiff denied any psychiatric complaints (AR 323, 348); there was a gap in treatment until April 15, 2000, when Plaintiff denied depression or anxiety (AR 303, 342, 347); and on March 9, 2010, and April 6, 2010, Plaintiff made no mention of mental complaints (AR 327, 332, 334).  (AR 547.)  The ALJ then also highlighted that the "only mention of any mental symptoms prior to the Date Last Insured occurred on June 30, 2010, when she sought treatment for chest pain and shortness of breath . . . It was noted that she became very anxious in the emergency room but her symptoms disappeared with Ativan.  She said that she had 'some anxiety related to helping to take care of a

---

[6]  The April 15, 2009 exam also showed 5/5 motor strength, and intact sensation.  (AR 343.)

[7]  On this date, the record also stated "Again, I strongly advised compliance with meds as well as exercise and diet." (AR 336.)

[8]  This citation refers to a myocardial perfusion scan performed on September 17, 2007, not September 18, though the record was signed on the September 18.  (AR 323.)  It is accurate that there is no reporting of a psychiatric complaint in this record, however it is not apparent that Plaintiff denied a psychiatric complaint as there is no record of a general review of symptoms or complaints preceding the procedure.  (AR 323.)

1 neighbor's newborn baby.'  She denied any prior psychiatric history.  She was given a

2 prescription of Xanax to be used as needed and the discharge diagnosis included anxiety

3 disorder."  (AR 238, 547.)  Based on these records and the opinion evidence,[9] the ALJ concluded

4 that Plaintiff's depression was non-severe.  (AR 548.)

5        The ALJ also found Plaintiff's cardiac condition was stable and that the RFC sufficiently

6 encompassed restrictions from the cardiac condition.   (AR 551.)   In support of this

7 determination, the ALJ first acknowledged that while the evidence did indicate that Plaintiff

8 suffered a heart attack due to hypertension in 1999 and underwent bypass surgery, cardiac

9 catherization and angioplasty, then noted that "subsequent findings over the next 11 years

10 indicate[d] her condition was stable."  (AR 550.)  The ALJ made the following observations

11 regarding these records: on August 17, 2007, Plaintiff "presented to the emergency room

12 complaining of epigastric pain radiating to the back beginning 20 minutes after eating [AR 267] .

13 . . had been out of medication for one week . . . was discharged with a diagnosis of acute pain

14 and a prescription for pain medication and a 'G.I. cocktail' [AR 268] . . . [and] [n]othing in the

15 evidence suggests this pain was related to a coronary problem,"; an August 22, 2007 record

16 showed a review of symptoms was negative for cardiovascular issues, though the impression

17 included chest pain not otherwise specified and coronary atherosclerosis not otherwise specified

18 (AR 355); a September 14, 2007 myocardial perfusion exercise stress test was "entirely normal"

19 (AR 324); October 6, 2007 chart notes indicated Plaintiff was being seen for a physical exam and

20 on review of symptoms, Plaintiff denied any cardiac issues, and she had normal heart sounds

21 (AR 349, 351); April 15, 2009 chart notes indicated that a on review of symptoms, Plaintiff

22 denied chest pain, pressure, or discomfort (AR 342); on May 4, 2009, Plaintiff denied any chest

23 pain or shortness of breath (AR 336); that Plaintiff next sought treatment on March 9, 2010 for

24 an acute respiratory infection when she did not complain of symptoms of coronary artery disease

25 (AR 332-334); and on April 6, 2010, Plaintiff denied chest pain or shortness of breath, and had

26 no edema or ulcers on her bilateral lower extremities (AR 327).  (AR 550-551.)

27

28    [9]  Here, the ALJ also discussed the opinion evidence relating to mental limitations, which the Court discusses separately below, infra Section IV(C)(4).

1    The ALJ then acknowledged that on June 30, 2010, Plaintiff complained of burning chest

2  pain, sweating, and shortness of breath that recurred while laying down but improved

3  immediately when sitting up.  (AR 238, 551.)  The ALJ noted the record reflected that stress

4  testing was completely normal, and that there was no acute coronary syndrome.  (AR 551.)  The

5  ALJ quoted the primary care physician's statement that Plaintiff's "symptoms are very unlikely

6  to be cardiac in nature given the normal cardiac workup and atypical presentation," that Plaintiff

7  "has been doing well cardiac-wise since" her bypass 11 years before, and highlighted that "Dr.

8  Hassanein noted her symptoms were very atypical for acute coronary syndrome, and that 'she

9  has done very well since her CABG and subsequent angioplasty and stenting.' " (AR 239, 243,

10  551.)  The ALJ also acknowledged that the discharge diagnosis included a history of myocardial

11  infarction secondary to left anterior descending artery dissection.  (AR 551.)

12    Following the summarization and review of the above records, the ALJ found: "As is

13  clear, the claimant's heart condition remained stable through the Date Last Insured [as]

14  [o]bjective testing was normal, and a cardiologist noted that she had been doing very well

15  following her bypass surgery."   (AR 551.)   Thus, "[t]he residual functional capacity

16  determination herein amply incorporates restrictions related to this condition." (Id.)

17    The ALJ then determined that as for Plaintiff's statements about her umbilical hernia, the

18  overall evidence was not consistent with reports of pain and limitation associated with the

19  condition.  (AR 551.)  In support of this determination, the ALJ made the following observations

20  regarding records relating to the hernia: after seeking treatment on August 17, 2007, for

21  epigastric pain, Plaintiff was discharged with a diagnosis of acute pain, and nothing in the

22  evidence suggested that the pain was related to a hernia (AR 267-68); on August 22, 2007, an

23  umbilical hernia was acknowledged on the record, however it was noted to be "asymptomatic"

24  (AR 355, 357); on October 26, 2007, a physical examination showed no tenderness or distention

25  in the abdomen and "no hernias," (AR 348); there was a gap in treatment of 18 months, then a

26  record dated April 15, 2009, indicated Plaintiff complained of umbilical pain when coughing or

27  touching the area (AR 303, 341, 347); on April 6, 2010, Plaintiff reported hernia pain, but

28  Plaintiff was discouraged that a specialist felt Plaintiff posed a high risk for hernia repair, and on

examination, Dr. Lee noted a reducible umbilical hernia and that Plaintiff did not want pain medication, and the doctor wrote that the hernia would be under "conservative management for now," but that Plaintiff should not do heavy lifting (AR 327); chart notes dated May 4, 2010, made no mention of a hernia (AR 332); and on June 30, 2010, Plaintiff's abdomen was "soft and nontender and nondistended," Plaintiff denied abdominal pain, and it was noted that she had an "obvious umbilical hernia which is easily reducible and is nontender" (AR 238).  (AR 551-552.)

The Court's review has determined that the ALJ's summary and utilization of the records above is accurate and supported by substantial evidence.  Other than Plaintiff's generalized and vague arguments summarized above, Plaintiff has not convincingly or specifically presented any argument that the ALJ's summary or analysis of the medical records as discussed here was improper.  Nor has Plaintiff presented sufficient evidence of objective medical records that would counter Defendant's arguments that the ALJ sufficiently relied in part on the absence of objective medical records.  Plaintiff did not file any reply brief specifically refuting the Defendant's presentation or arguments regarding the ALJ's use of the records here.

Based on the foregoing, the Court finds the ALJ reasonably found Plaintiff's allegations of disabling physical or mental impairments were inconsistent with the record of objective clinical evidence.  The Court finds these were proper determinations supported by substantial evidence, and while not sufficient standing alone, are clear and convincing determinations when considered in conjunction with the ALJ's reasoning discussed in the following subsections, which provides additional support for the appropriateness of the ALJ's credibility determinations.  See Vertigan, 260 F.3d at 1049 ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it.")  Burch, 400 F.3d at 680-81   ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis . . . Contrary to Burch's argument, the ALJ did not solely rely on the minimal objective evidence and Burch's daily activities in discrediting her testimony.").

/ / /

/ / /

2.    Plaintiff's Conduct and Inconsistent Statements

Defendant argues the ALJ also reasonably found Plaintiff's conduct and statements inconsistent with each other and with her allegations of disability (AR 546-553), and while Plaintiff has claimed being restricted by her various impairments, the record includes many of her statements to doctors denying any problems related to such impairments.  (Opp'n 15.)

As stated above, in assessing the claimant's credibility, the ALJ may consider: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  Tommasetti, 533 F.3d at 1039 (quoting Smolen, 80 F.3d at 1284); see also Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.").

Here, the ALJ found Plaintiff's "subjective statements regarding her impairments and associated limitations" were not "entirely consistent with the evidence."  (AR 553.)  In support of this finding, the ALJ pointed to two main areas of inconsistency: (1) Plaintiff's reasons for leaving her prior work and acceptance of unemployment benefits; and (2) Plaintiff's testimony regarding fatigue.  (AR 553.)  The Court first turns to the ALJ's comments regarding the fatigue testimony.  The ALJ stated:

> At the hearing on August 6, 2018, the claimant said that in 2009 she remembers being very tired and fatigued all the time.  She also said that her body ached all the time.  She said her fatigue was "through the roof."  However, she did not mention fatigue to any of her treating providers from 2007 through her Date Last Insured.  In fact, on June 30, 2010, she denied fatigue, malaise or lethargy (AR 247).

(AR 553.)

The Court summarized the entirety of the relevant August 6, 2018 hearing testimony above, supra Section II(B).  It appears the testimony the ALJ referred to is when Plaintiff's

1  counsel examined Plaintiff, and the ALJ's description of the testimony is accurate.  (AR 578.)

2  Specifically, counsel asked about problems with fatigue, and Plaintiff answered she felt fatigued

3  or tired all of the time.  (Id.)  Plaintiff confirmed she would have to take a break after starting

4  activities.  (Id.)  Plaintiff stated it varied day to day, but there were points where Plaintiff would

5  want to sleep all day, and she would get up and then half an hour later she was so exhausted and

6  would just want to lay down again.  (Id.)  It wasn't every day, but Plaintiff would be exhausted a

7  lot of the time, and her "fatigue was through the roof."  (Id.)  Plaintiff would get up because she

8  still had children at home, and would function as much as she could, but she was tired to the

9  point where she just couldn't function like a normal person.  (Id.)  Plaintiff estimated she was

10  below a thirty or forty percent level of functioning, and was not sure if it was from diabetes, or

11  her heart.  (Id.)

12      Aside from mentioning Plaintiff's testimony regarding fatigue and the ALJ's summary of

13  Plaintiff's testimony concerning such in the factual summary portion of Plaintiff's opening brief,

14  Plaintiff's briefing makes no mention of fatigue in the argument portion nor mention of records

15  demonstrating fatigue during this period.  Plaintiff did not file a reply brief addressing

16  Defendant's arguments regarding the ALJ's use of the fatigue testimony and lack of records in

17  addressing Plaintiff's credibility.  Plaintiff only generally argues that the ALJ cannot reject

18  testimony solely based on a lack of objective medical evidence, but does not specifically address

19  the two specific rationales offered by the ALJ in this portion of the opinion.  (Br. 7-8; AR 553.)

20  Given this absence of a specific challenge, it appears any argument that the ALJ's reliance on the

21  fatigue testimony was error would be waived.  See White v. Colvin, No. 2:14-CV-00334-MKD,

22  2016 WL 5109519, at *4 (E.D. Wash. Sept. 19, 2016) (although finding the reason to be

23  ultimately supported by substantial evidence, noting "Plaintiff ha[d] not challenged [one of

24  multiple] bas[es] for the credibility determination, meaning any objection [was] waived.");

25  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d at 1161 n.2 ("We do not address this finding

26  because Carmickle failed to argue this issue with any specificity in his briefing.").

27      Nonetheless, even absent a specific challenge, given the review of the records and

28  hearing testimony above, the Court finds that the ALJ's use of the fact that Plaintiff never

mentioned fatigue to any of her treating providers from 2007 until the date last insured, despite the fact that Plaintiff testified she felt fatigued or tired all of the time, and testified that she was exhausted a lot of the time and her fatigue was "through the roof" during this same time period, is a clear and convincing reason for discounting Plaintiff's testimony.

Further, in this portion of Defendant's briefing, Defendant also re-highlights the ALJ's discussion and citation to the records pertaining to Plaintiff's denial of claims of musculoskeletal issues, depression or psychiatric issues, hernia, and cardiopulmonary ailments, during the relevant period.  (Opp'n 16; AR 546-551.)  In the previous subsection, the Court reviewed this portion of the ALJ's opinion and the records cited therein.  While this discussion is in a different portion of the ALJ's opinion than the portion dealing specifically with the finding of inconsistent statements, the Court agrees with Defendant that these records provide additional support for the ALJ's overall determinations that the Plaintiff's allegations were not consistent with the evidence as a whole and inconsistent with Plaintiff's testimony.  (Opp'n 16.)  Plaintiff did not file a reply brief and thus has again not disputed or specifically responded to these arguments.

The Court now turns to the ALJ's finding that Plaintiff gave inconsistent accounts of why she stopped working.  The ALJ stated:

> She testified that she stopped working in 2005 because she fell down three times and was terminated.  However, in her disability report – adult, she said she denied that she stopped working due to impairments, and instead indicated that she stopped working for "other reasons," because she was laid off, on October 31, 2005 [AR 180-181].  She testified after she stopped working, she then received unemployment benefits for six to 12 months, and during this time she was applying for jobs.  The acceptance of unemployment benefits, which entails an assertion of the ability to work, is not entirely consistent with a claim of disability.

(AR 553.)

The disability report questionnaire referenced by the ALJ, states that Plaintiff stopped working on October 31, 2005, because of the "other reason" that she was "laid off."  (AR 181.)  In response to the question of: "Even though you stopped working for other reasons, when do you believe your conditions(s) [sic] became severe enough to keep you from working?" Plaintiff answered December 1, 2005.  (AR 181.)  In response to the question of whether the condition caused Plaintiff to make changes in her work activity, Plaintiff answered "No."  (AR 181.)

The hearing testimony that the ALJ refers to appears to be from the original April 30, 2015 hearing.  (AR 34-63, 550, 553.)  At the 2015 hearing before the previous ALJ (the "First ALJ"), the First ALJ asked about losing her job, and Plaintiff stated it was "[b]ecause I started to lose my balance and I fell like three times at my job site, so I was terminated."  (AR 45.)  The Plaintiff then confirmed that it was after her heart attack that she got that job.  (Id.)  The First ALJ inquired if she had fallen before, and Plaintiff confirmed that she had balance problems, but denied falling previously.  (Id.)  The First ALJ asked if she found out from the doctor why she fell, and Plaintiff stated the doctor did not know why she fell.  (AR 45-46.)  The First ALJ inquired further if it was due to slipping or balance, and Plaintiff stated it was because of balance, that she remained conscious the whole time, and that she did not injure herself seriously the times she fell.  (AR 46.)  The First ALJ then asked whether the employer terminated Plaintiff because she was falling, and Plaintiff stated: "They terminated me.  They did not give me a reason."  (Id.)  The First ALJ asked whether Plaintiff suspected the falling was the reason, and then Plaintiff stated: "Yes, sir."  (Id.)

The First ALJ then asked whether Plaintiff filed for unemployment benefits after she left the job, and Plaintiff answered yes, she received unemployment benefits.  (AR 46-47.)  Plaintiff first stated she did not recall how long she received benefits, but then answered that it was maybe six months to one year.  (AR 47.)  The First ALJ asked whether she was actively looking for work during the period of time she was drawing benefits, and Plaintiff confirmed she was, and when asked what types of jobs she was applying for, Plaintiff stated: "McDonald's, any type of food service work," but she did not get any leads.  (AR 47.)

Based on review of the questionnaire and the relevant hearing testimony, the Court finds the ALJ's statements concerning Plaintiff's reasons for leaving work and receipt of unemployment benefits to be accurate.  Plaintiff did not mount a specific challenge to the ALJ's use of Plaintiff's receipt of unemployment benefits, but the Court will now address some of the law pertaining to that rationale.

A claimant's seeking of employment does not necessarily equate to an adequate reason for an adverse credibility finding.  Webb v. Barnhart, 433 F.3d 683, 687-88 (9th Cir. 2005)

(rejecting as a basis for finding a claimant not credible, the claimant's having sought employment during the relevant period as it showed "no more than that he was doing his utmost, in spite of his health, to support himself."). Nonetheless, "[c]ontinued receipt of unemployment benefits does cast doubt on a claim of disability, as it shows that an applicant holds himself out as capable of working." Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014). However, the record must establish that Plaintiff held herself out for full-time work. Carmickle, 533 F.3d at 1161–62 ("First, while receipt of unemployment benefits can undermine a claimant's alleged inability to work fulltime . . . the record here does not establish whether Carmickle held himself out as available for full-time or part-time work [and] [o]nly the former is inconsistent with his disability allegations [and] [t]hus, such basis for the ALJ's credibility finding is not supported by substantial evidence.").

On one hand, on the face of the record the Court has reviewed, it is not absolutely clear whether or not Plaintiff held herself out for full time work. See Thomas v. Colvin, No. CV 15-01451-RAO, 2016 WL 1733418, at *5 (C.D. Cal. Apr. 29, 2016) ("It is unclear, however, whether she held herself out as available for full-time or part-time work. Thus, the Court finds that this reason for discounting Plaintiff's credibility is not supported by substantial evidence."); Rys v. Berryhill, No. CV 16-8391-JPR, 2018 WL 507207, at *14 (C.D. Cal. Jan. 19, 2018) ("The record here does not indicate how or under what circumstances Plaintiff received his unemployment benefits, including whether it was for full-time or part-time work . . . Thus, without more, the ALJ's reliance on Plaintiff's apparent receipt of unemployment benefits was neither a clear nor convincing reason for discounting his statements' credibility."); Henderson v. Comm'r, Soc. Sec. Admin., No. 6:17-CV-00481-HZ, 2018 WL 2102401, at *6 (D. Or. May 4, 2018) ("As Plaintiff correctly points out, the record does not provide any additional information on whether he applied for full-or part-time work. The Commissioner argues that Plaintiff's applications for truck-driving jobs and the fact that he lost his job for reasons unrelated to his disability create the reasonable inference that Plaintiff's unemployment applications were for full-time work . . . but the Court finds this argument unpersuasive.").

On the other hand, there is some indication from the testimony that Plaintiff did hold

1    herself out as available for full time work, given she confirmed she was "actively looking" for

2    employment, and testified she was applying for "any" type of food-service employment.  (AR

3    47.)  Further, the period of time of receiving unemployment benefits being six to twelve months

4    (AR 47), is a significant period of time to receive such benefits.  Lozano v. Colvin, No. EDCV

5    15-2579-KS, 2016 WL 7227879, at *6 (C.D. Cal. Dec. 12, 2016) ("Another factor the ALJ

6    considered in discounting Plaintiff credibility was Plaintiff's earnings record, which showed that

7    she had received unemployment benefits from first quarter 2012 through the second quarter of

8    2013 . . . Plaintiff's continued receipt of unemployment benefits long after her alleged disability

9    onset date of May 23, 2011 is a clear and convincing reason for discounting Plaintiff's testimony

10   because, as the ALJ pointed out, to obtain unemployment benefits, Plaintiff had to certify that

11   she was 'willing and able to engage in work activity' and this is inconsistent with her claim of

12   disability."); c.f. Ghanim, 763 F.3d at 1165 ("But here, Ghanim actually declined unemployment

13   benefits within about a month of his onset date; rather than undercut his claim of disability, this

14   prompt refusal of unemployment benefits supports it.").

15         Given the record the Court has reviewed, the Court would be more inclined to find the

16   ALJ did not err in utilizing the receipt of unemployment benefits for this length of time,

17   particularly considering this determination by the ALJ was an additional or bolstering factor

18   considered in relation to what the ALJ found to be inconsistent statements concerning Plaintiff's

19   reasons for leaving her employment.  See Copeland v. Bowen, 861 F.2d 536, 542 (9th Cir. 1988)

20   (affirming ALJ's credibility determination where ALJ "did not find the claimant's testimony or

21   allegations of disability to be fully credible in light of the fact that he left work because he was

22   laid off (although allegedly because of medical reasons); received unemployment insurance

23   benefits thereafter (apparently considering himself capable of work and holding himself out as

24   available for work); his allegations of disability were not supported by the medical records for

25   the period prior to September 1985; and his testimony at the hearing appeared to be somewhat

26   exaggerated (he testified that the reason he had not brought his cane to the first administrative

27   hearing was because he left it in the car) and appeared somewhat self-serving.").

28         Additionally, Plaintiff did not mount a specific and articulable challenge to ALJ's use of

the receipt of unemployment benefits, and thus Defendant was not put on notice to find and direct the Court to support in the record that further establishes Plaintiff was seeking full-time work.  White, 2016 WL 5109519, at *4 ("Plaintiff has not challenged this basis for the credibility determination, meaning any objection is waived."); Carmickle, 533 F.3d at 1161, n.2.  Similar to the fatigue issue discussed above, aside from mentioning Plaintiff's hearing testimony regarding her proffered reason for leaving her job, namely falling three times and being terminated (Br. 4), and the ALJ's summary of Plaintiff's hearing testimony concerning such in the factual summary portion of Plaintiff's opening brief (Br. 5), there is no specific challenge or refutation of the ALJ's use of the inconsistent reasons for leaving work or the receipt of unemployment benefits in the argument portion, and Plaintiff did not file a reply brief addressing Defendant's arguments regarding the ALJ's use of this reason.  Plaintiff only generally argues that the ALJ cannot reject testimony solely based on objective medical evidence, but does not specifically address the two rationales offered by the ALJ here.  (Br. 7-8; AR 553.)

Finally, even if the particular aspect of reliance on the receipt of unemployment benefits was not based on substantial evidence in record not establishing Plaintiff was seeking full-time work, any error would be harmless as "the ALJ's remaining reasoning *and ultimate credibility determination* were adequately supported by substantial evidence in the record."  Carmickle, 533 F.3d at 1162 (emphasis in original) ("On this record, the ALJ's error in relying on Carmickle's receipt of unemployment benefits and on his relatively conservative pain treatment regime does not 'negate the validity' of the ALJ's adverse credibility finding."); White, 2016 WL 5109519, at *5 ("The ALJ's reliance on Plaintiff's receipt of unemployment benefits, on this record, was harmless error.  Here, the ALJ cited other properly supported reasons for discrediting Plaintiff.").

### 3.   Course of Treatment and Plaintiff's Non-Compliance

Defendant next argues that the ALJ properly found that Plaintiff's course of treatment, gaps in treatment, and lack of compliance with treatment, belied her claims of disabling symptoms (AR 546-553).  (Opp'n 17.)   Defendant argues the ALJ properly noted a significant gap in treatment of eighteen (18) months between October of 2007 and April of 2009, during which Plaintiff did not seek medical attention for any of her impairments, including her

1  psychiatric complaints, or cardiac issues.  (AR 546, 547.)  Defendant contends that even though

2  this gap is before the alleged onset date of June 2, 2009, it demonstrates that Plaintiff was not

3  experiencing any severe symptoms immediately before the relevant period, which further

4  supports the ALJ's finding that her overall treatment, when she did finally seek it out, was

5  benign.

6         Defendant emphasizes the ALJ's findings regarding Plaintiff's medical records once she

7  did receive treatment following the eighteen (18) month gap in treatment.   (Opp'n 18.)

8  Specifically, in reviewing records relating to hypertension and finding the condition non-severe,

9  the ALJ noted that after Plaintiff resumed treatment on April 15, 2009, chart notes indicated

10 Plaintiff "was not taking cholesterol medication and that it was not under good control . . . blood

11 pressure was elevated and she had been out of her hypertension medication for a week . . . but

12 she denied headache or blurred vision [and] [h]er physician noted, 'the current medical regiment

13 is effective' with respect to hypertension."  (AR 546.)  The ALJ cited a May 4, 2009 record, that

14 reflected Plaintiff's "blood pressure control was suboptimal, but she denied headache or blurred

15 vision, and the doctor 'strongly advised compliance.' "  (Id.)  The ALJ also cited: an April 6,

16 2010 record, wherein Plaintiff denied headache or blurry vision, was tolerating blood pressure

17 medication, and her hypertension was stable; a March 9, 2010 record wherein blood pressure was

18 elevated, but Plaintiff had not taken her medication that day; and "[c]hart notes subsequent to her

19 Date Last Insured dated January 28, 2011, [that] indicate[d] that the claimant did not take her

20 hypertension medication regularly."  (AR 546.)  Based on these records, the ALJ concluded:

21          Thus, there is no evidence that these conditions have result[ed] in significant and
           ancillary effects, such as end organ damage.  Nor is there evidence that they are
22         uncontrollable and compliance appears to be an issue, as the claimant admitted
           not taking her medication on occasion.  There is simply no evidence to suggest
23         that these conditions had more than a minimal impact on her ability to perform
           work-related activities for any consecutive 12-month period and the undersigned
24         finds them non-severe.

25 (AR 546.)  The ALJ additionally noted the eighteen (18) month gap in treatment and minimal

26 course of treatment in regards to musculoskeletal issues and mental impairments in this section,

27 finding such alleged ailments to be non-severe.  (AR 547-548.)

28         An ALJ may discount an allegation of disabling excess pain based on "an unexplained, or

inadequately explained, failure to seek treatment or follow a prescribed course of treatment.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  "While there are any number of good reasons for not doing so . . . a claimant's failure to assert one, or a finding by the ALJ that the proffer[]ed reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony."  Id.

Plaintiff argues that the ALJ's attempt to reject the testimony due to poor compliance with treatment is not based on substantial evidence, as the record demonstrates that any compliance issues are due to Plaintiff not being able to afford treatment.  (Br. 10.)  Plaintiff is correct that "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds."  Trevizo v. Berryhill, 871 F.3d 664, 680–81 (9th Cir. 2017) (quoting Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995)); Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("It is true that benefits may not be denied to a disabled claimant because of a failure to obtain treatment that the claimant cannot afford . . . This rule implements the agency's official policy: Social Security Ruling ("SSR") 82–59 provides that an individual's failure to follow prescribed treatment is justifiable if the individual is unable to afford such treatment.").

Plaintiff cites the following records in support of her argument that any non-compliance issues were due to not being able to afford treatment: AR 327 (cannot afford medical insurance copay); AR 759-760 (cannot afford medicine); AR 994 (difficulty affording syringes to treat diabetes); AR 1016 (unable to afford doctor appointment); AR 1331 (unable to afford physical therapy); AR 2334 (unable to afford test strips to test blood sugar); AR 3088 (declined to go into medical office due to high co-pay); AR 3493 (cannot afford to make doctor appointment); AR 4374, 4377 (unable to afford insulin).  (Br. 9.)  Plaintiff concedes the ALJ acknowledged Plaintiff's issues with the cost of the treatment (AR 553), and while the ALJ acknowledged such, argues the rejection of the testimony due to non-compliance despite the clear inability to afford the treatment was error and not supported by substantial evidence.  (Br. 10.)

Defendant first responds that the records cited, aside from one, which the ALJ acknowledged, are after her date last insured.  (Opp'n 18.)  Defendant further highlights that in any event, during this time period, in December 2013, Plaintiff was advised to "check with [the]

1    medical secretary for financial help." (Opp'n 19.)

2           Defendant is correct that aside from one record which the ALJ acknowledges in the

3    decision, each record cited by Plaintiff is from the time period after the date last insured.

4    Plaintiff did not file a reply brief addressing this fact, and thus did not provide the Court with

5    additional evidentiary support.  The Court has reviewed and will now provide a summary of each

6    of the relevant portions of the records cited by Plaintiff for the argument that the medical record

7    is "replete with notations that [Plaintiff] has difficulty affording treatment."  (Opp'n 19.)

8           First, the only record from a date prior to the date last insured is the April 6, 2010 record

9    that the ALJ did mention in the opinion.  (AR 553.)  On April 6, 2010, under the notes relating to

10   diabetes, the record states Plaintiff "didn't follow up and didn't do blood work because she

11   couldn't afford the copay."  (AR 327.)  The record also notes that Plaintiff was "discouraged to

12   know that Dr. Davis thinks she is high risk for hernia repair," that she does not want pain meds at

13   this time, and that she is willing to go through gastric bypass surgery.  (AR 327.)  This record

14   was cited by the ALJ as part of numerous records regarding Plaintiff's compliance with

15   recommended treatments, cited in support of the ALJ's finding that "despite poor compliance,

16   Plaintiff has not suffered from serious consequences of uncontrolled diabetes, such as ulcers,

17   neuropathy, nephropathy, ketoacidosis, or similar complications."  (AR 553.)  Specifically, the

18   ALJ cited that in May of 2009, Plaintiff's doctor strongly advised compliance, then the next

19   record cited is the April 6, 2010 record and the ALJ noted that "[u]pon follow up with Dr. Lee on

20   April 6, 2010, she said she did not follow up with blood work for diabetes due to the cost . . .

21   [t]he impression was that her diabetes was uncontrolled."  (AR 552-553.)[10]

22          The other records fall on dates after the date last insured.  On December 19, 2013,

23   Plaintiff presented by telephone for urgent care relating to chest wall pain, and the record states

24   Plaintiff had "ran out [of] her pills, do[es]n't have money to purchase any more medicines . . .

25

---

26   [10]  Defendant argues that as for this record that was acknowledged by the ALJ, this claim appeared less than genuine
     given that at the same visit, Plaintiff indicated that she did not want to take pain medication for her hernia and was
27   willing to proceed with a gastric bypass surgical procedure (AR 327). Defendant argues this indicates that Plaintiff
     did not lack financial resources.  (Opp'n 18-19.)  The Curt will not address this argument as it was not clearly stated
28   by the ALJ.

1    spent 34 minutes on the phone explaining her current condition . . . [w]ith her pain description

2    sounds like neuropathy from shingles . . . [a]dvised to get an EKG and examination for the lump

3    . . . Patient declined to come in due to high co-pay . . . Requesting a call from primary care

4    physician tomorrow . . . Eats all fast food, snacks and easy to buy foods . . . fruits and veg are

5    expensive . . . Needs to be compliant with diet and exercises, keep checking blood sugars before

6    breakfast, scheduled appointments with physician."  (AR 759-760.)[11]  On July 2, 2014, Plaintiff

7    identified the following as her primary barrier to lowering blood sugar and improving health:

8    "[diabetes] for 4yrs, insurance does not cover medications so fills at outside pharmacy, did not

9    qualify [for] financial assistance this year so may not be able to afford syringes, husband ill . . .

10   so busy and overwhelmed since he is not working and 30k less income . . . advised that without

11   exact glucometer information I have limited ability to effectively work with her on managing

12   diabetes today. Pt agrees to monitor and record results."  (AR 994.)  On October 6, 2014,

13   Plaintiff presented by telephone for a yeast infection, asked for a prescription, stated she could

14   not afford to make an appointment to be seen, and stated she would like the prescription called in

15   to the pharmacy.  (AR 1016.)[12]  On September 16, 2015, Plaintiff presented for back pain, she

16   reported she had not received physical therapy, and the record notes Plaintiff declined physical

17   therapy "due to cost," and that she wanted to know about alternative means to address back pain

18   other than taking pills, such as acupuncture.  (AR 1331.)  On February 15, 2017, Plaintiff called

19   the provider stating she could not afford blood sugar test strips and inquired about other options.

20   (AR 2334.)  On June 25, 2018, Plaintiff presented by telephone and Plaintiff stated there were "a

21   lot of other health issues going on which has been causing her financial stress.  She has not

22   started the Humulin R before lunch as she is not able to afford it."  (AR 4374.)

23        Given these records, the Court finds the ALJ's discounting of Plaintiff's testimony due to

24   her course of treatment, including a significant gap of eighteen months in treatment, and issues

25   of Plaintiff's compliance with treatment, were clear and convincing reasons, and Plaintiff's

26   ───────────────
     [11]  Plaintiff cites to duplicate records in briefing stating: "AR 3088 (declined to go into medical office due to high

27   co-pay)," however the citation is to the same December 19, 2013 record.  (Br. 9; AR 759-760, 3088.)

28   [12]  Plaintiff again cites a duplicative record, stating: "AR 3493 (cannot afford to make doctor appointment),"
     however the citation is to the same October 6, 2014 record.  (Br. 9; AR 1016, 3493.)

1  sporadic records demonstrating some complaints regarding paying for treatment, mainly after the

2  relevant period, do not critically undermine the ALJ's determination in this area.  The ALJ's

3  findings as to issues of compliance in relation to hypertension (AR 546), and in relation to

4  diabetes (AR 553), are supported by substantial evidence, and the Plaintiff's reference to the

5  records concerning issues of affording treatment are not persuasive, given the repeated issues of

6  noncompliance, and the fact that the only record cited by Plaintiff that was on a date during the

7  relevant period, was in fact acknowledged by the ALJ (AR 553).  See Trevizo, 871 F.3d at 680–

8  81 ("At a handful of other medical visits, treating doctors expressed concerns with Trevizo's

9  compliance without giving any explanation as to why Trevizo might be noncompliant [and]

10  [t]hese instances of noncompliance may properly be weighed against finding Trevizo's

11  testimony to be believable."); Spittle v. Astrue, No. 3:11-CV-00711-AA, 2012 WL 4508003, at

12  *5 (D. Or. Sept. 25, 2012) ("The record is unclear as to whether plaintiff could afford additional

13  mental health treatment.  However, the ALJ's finding was not irrational given the other treatment

14  plaintiff was able to obtain . . . Accordingly, I do not find that there is sufficient evidence in the

15  record to suggest that the plaintiff was unable to afford any mental health treatment so as to

16  render the ALJ's findings erroneous.").[13]  This is not a case like Gamble where the claimant

17  would have been found disabled under a listing but for the inability to afford treatment.  See

18  Reyes v. Comm'r of Soc. Sec., No. C 10-04571 JSW, 2012 WL 1094337, at *8–9 (N.D. Cal.

19  Mar. 29, 2012) ("Reyes cites Gamble for the simple proposition that claimants cannot be denied

20  benefits because they have failed to obtain medical treatment that they cannot afford . . . Unlike

21

---

22  [13]  See also Rams v. Astrue, No. 1:11-CV-02059 GSA, 2013 WL 85298, at *8 (E.D. Cal. Jan. 8, 2013) ("However,

23  unlike Gamble where the medical record clearly established a severe impairment and the claimant's inability to
    afford the medical care necessary to treat his condition, here, there is little to no evidence of a severe back

24  impairment prior to 2008.  This coupled with evidence that Plaintiff had medical insurance coverage through Kaiser
    distinguishes this matter from Gamble.  Thus, to the degree the ALJ relies upon a lack of MRI or CT scans that
    would constitute objective evidence of Plaintiff's back impairments, that finding is not irrational given the lack of

25  medical evidence regarding a severe back impairment prior to 2008 and the fact Plaintiff was able to obtain other
    medical treatment during the same period.  Accordingly, the Court finds there is insufficient evidence in the record

26  to suggest that the Plaintiff was unable to afford any medical treatment regarding her back complaints so as to render
    the ALJ's findings in this regard erroneous."); Allen v. Colvin, No. 1:13-CV-01523-AA, 2014 WL 5167305, at *3

27  (D. Or. Oct. 8, 2014) ("Here, the record reveals that plaintiff declined counseling, not because she could not afford
    it, but instead because she felt that medications alone would help with her symptoms.  As such, this Court finds that

28  the ALJ did not err by factoring plaintiff's failure to seek treatment into her adverse credibility finding.").

1   in *Gamble,* there is no evidence in the record that the ALJ found that Reyes did not have a

2   disability because she could not afford treatment.").[14]

3        Defendant additionally argues that the ALJ reasonably found Plaintiff's conservative

4   treatment of her hernia undermined her claim of disabling symptoms.  (Opp'n 19.)  As the ALJ

5   noted, Plaintiff's doctor instructed Plaintiff to treat her hernia conservatively by avoiding heavy

6   lifting.  (AR 327, 552).  The ALJ found the overall evidence consistent with the RFC, "in light of

7   the numerous occasions the claimant made no mention of complaints related to her hernia, the

8   fact she declined medication, and the fact her doctor precluded only heavy lifting."  (AR 552.)

9   This provides additional support for the ALJ's findings regarding conservative treatment that are

10  not undermined by any claim of inability to pay.  See Saul v. Berryhill, No. 1:17-CV-01744-

11  BAM, 2019 WL 1367802, at *7 (E.D. Cal. Mar. 26, 2019) ("The ALJ did not discount Dr.

12  Wolney's opinion because Plaintiff failed to obtain treatment, conservative or otherwise, that

13  was recommended by her providers.  Instead, the ALJ discounted Dr. Wolney's opinion because

14  the treatments that Plaintiff's providers prescribed were conservative in nature and therefore

15  inconsistent with the severity of the limitations described in Dr. Wolney's report.  Whether

16  Plaintiff was able to afford treatment was immaterial to this finding because the ALJ's inquiry

17  was the type of treatment prescribed, not Plaintiff's failure to obtain the recommended

18  treatment.").  Although a declination of treatment due to side effects may be a proper basis for a

19  claimant's conservative treatment,[15] the ALJ also addressed Plaintiff's declination of medication

20

21  [14]  See also Chavarin v. Berryhill, No. 317CV00104MMDVPC, 2018 WL 992060, at *7 (D. Nev. Jan. 10, 2018)
22  (finding Gamble v. Charter to be "inapposite as it holds solely that a disability claimant may not be denied benefits
    where his or her condition is remediable but the remedy, such as a prosthetic, is unaffordable . . . The record does
23  not demonstrate that more aggressive treatment options were unavailable to plaintiff for purely financial reasons.  In
    fact, the ALJ points out that plaintiff had the opportunity to elect surgery or additional epidurals, but refused to do so
    because of his fear of invasive treatment, not because of poverty . . . In any event, the ALJ did not take issue with
    plaintiff's failure to seek out more aggressive, and expensive, treatment options.  Rather, the ALJ focused on
24  plaintiff's failure to continue treatment that he had previously engaged in, and his subsequent failure to immediately
    report his second back injury to a medical professional.  (AR 36.)  By eventually resuming treatment, plaintiff
25  established that poverty was not a bar to timely and consistently seeking out that treatment.  The ALJ was not
    required to inquire as to why plaintiff paused his medical treatment because it did not appear related to plaintiff's
26  financial state."), report and recommendation adopted, No. 317CV00104MMDVPC, 2018 WL 988064 (D. Nev.
    Feb. 20, 2018).

27  [15]  Carmickle, 533 F.3d at 1162 ("[A]lthough a conservative course of treatment can undermine allegations of
28  debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good
    reason for not seeking more aggressive treatment . . . Carmickle testified that he does not take other pain medication

for her hernia, stating "[w]hile the claimant testified that she did not want medication due to side effects, there is no indication that she in fact experienced side effects or that she requested alternatives." (AR 552.) Plaintiff does not address this aspect of the ALJ's opinion, and the Court finds the reasoning provides additional to support to the ALJ's discounting of Plaintiff's testimony based on a conservative course of treatment.

### 4.      Inconsistency with Medical Opinions

Defendant argues the ALJ reasonably found Plaintiff's allegations of disability inconsistent with various medical opinions and assessments (AR 546-553). (Opp'n 19.) First, as the ALJ discussed, "no treating provider ha[d] indicated that she had any mental limitations prior to her Date Last Insured," and non-examining state agency reviewing physician Dr. Funkenstein and state agency psychologist Dr. Hawkins, found no severe mental impairment with only mild difficulties in maintaining social functioning. (AR 547.) The ALJ assigned significant weight to the state opinions to the extent they found no severe mental impairment, but the ALJ found no limitation in social interaction, with a mild limitation in understanding, remembering and applying information. (Id.)

The ALJ considered the opinions of non-examining State agency physicians Dr. Narabadi and Dr. Taylor, and assigned a more restrictive RFC than opined, finding such to be more consistent with Plaintiff's treating doctor's recommendation to avoid heavy lifting due to the hernia:

> As for the opinion evidence not otherwise discussed above, Dr. Nasrabadi and Dr. Taylor the non-examining State agency physicians who reviewed the documentary evidence on July 31, 2013 and October 1, 2014, felt that the claimant could perform medium work (Exhibit 1A; 3A). These opinions are afforded reduced weight, and a more restrictive residual functional capacity determination has been adopted herein, in order to accommodate all of the severe and nonsevere impairments that existed prior to her Date Last Insured, including her obesity and hernia. Per her treating doctor, the claimant was instructed to avoid heavy lifting, and thus a light residual functional capacity is appropriate.

(AR 553.)

---

because of adverse side effects. In 2003, he also indicated that he would prefer to take Relafen, which was prescribed by Dr. Patton, but his insurance does not cover this medication. Both of these assertions are supported by Dr. Patton's treatment notes . . . On this record, Carmickle's minimal treatment regime is not a proper basis for finding him non-credible.").

The ALJ also summarized treatment records from June of 2010 relating to Plaintiff's cardiac condition:

> On June 30, 2010, she complained of burning chest pain, sweating, and shortness of breath while lying down that improved immediately when sitting up but recurred when lying down . . . Stress testing was completely normal, and there was no acute coronary syndrome.  Her primary care physician, Dr. Lee, noted, "[h]er symptoms are very unlikely to be cardiac in nature given the normal cardiac workup and atypical presentation."  In fact, "[s]he has been doing well cardiac-wise since" her bypass 11 years earlier . . . Dr. Hassanein noted her symptoms were very atypical for acute coronary syndrome, and that "she has done very well since her CABG and subsequent angioplasty and stenting."

(AR 551.)[16]   The ALJ concluded that "[a]s is clear, the claimant's heart condition remained stable through the Date Last Insured.  Objective testing was normal, and a cardiologist noted that she had been doing very well following her bypass surgery.  The residual functional capacity determination herein amply incorporates restrictions related to this condition."  (AR 551.)

When considered with the reasons discussed in the previous subsections, the Court finds the inconsistency with the state agency medical opinions and other medical opinions are clear and convincing reasons for rejecting the claimant's testimony.  See Kallenbach v. Berryhill, 766 F. App'x 518, 521 (9th Cir. 2019) ("The ALJ provided specific, clear, and convincing reasons for discounting Kallenbach's testimony, including inconsistencies between Kallenbach's allegations of impairment and his medical treatment records, inconsistencies between the medical opinion evidence and Kallenbach's testimony, and Kallenbach's failure to seek and adhere to prescribed treatment."); Lake v. Colvin, 633 F. App'x 414, 415 (9th Cir. 2016) ("The ALJ provided specific, clear, and convincing reasons for the credibility assessment, including inconsistencies between Lake's testimony regarding his limitations and the medical opinions and documentary evidence."); White v. Colvin, 622 F. App'x 639 (9th Cir. 2015) ("The ALJ provided specific, clear, and convincing reasons for the credibility assessment, including inconsistencies between White's testimony regarding her limitations and the medical opinions and record."); Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995) (holding the ALJ gave valid specific reasons where a doctor "believed that Moncada could do sedentary work, that Moncada

---

[16]   It appears these records may have all been dictated by Dr. Hassanein, and only signify that Plaintiff's treating doctor is Dr. Lee.  (AR 23

said that he uses pain medication infrequently, and that Moncada's testimony about his daily living activities were much more limited than those reported in a disability report completed by him prior to his testimony.").

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ provided clear and convincing reasons for discounting Plaintiff's testimony.  The Court finds the ALJ's decision to be supported by substantial evidence in the administrative record, and free from remandable legal error.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Liza Moreno.  The Clerk of the Court is DIRECTED to CLOSE this action.

IT IS SO ORDERED.

Dated:   __January 11, 2021__                          _____

UNITED STATES MAGISTRATE JUDGE